## Jo. Cartwright v. The State.

1. CRIMINAL LAW. *Charge.* It is not reversible error for a judge to hand to some of the jurors before argument of the cause, a charge which had been given the jury in a former trial in same cause, not being given to them as containing instruction by which they were to be governed, but the object being to see if the jury could read his handwriting with facility. No possible prejudice could result to defendant.

2. SAME. *Separation of the jury.* It is important to a fair trial that the jury should not be permitted to mingle with other citizens. If permitted *prima facie,* the verdict is vicious. But this presumption may be removed by evidence showing the juror had no such communication. It is the opportunity of tampering with a juror, afforded by the separation, which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there is no cause for new trial.

3. SAME. *Juror competent.* A new trial will not be granted because a juror, before his selection, stated. that "he had heard the defendant had killed the deceased while sitting in a chair doing nothing; that he believed it but did not know whether it was true." From his having been selected, the presumption is he was competent. A

Cartwright *v.* The State.

stronger case must be made after trial against a juror, in order to set aside a verdict than would be necessary to set him aside before selection. If a juror had read the statement of the homicide in a newspaper, and had formed no opinion, he would be competent.

4. SAME. *Relationship of juror and prisoner.* A new trial will not be granted if the wife of a juror is kin to the wife of the defendant within the prohibited degree, and neither knew it when the juror was selected. This species of disqualification, *propter defectum,* must be taken advantage of before the jury is sworn, although the prisoner is ignorant of it.

5. SAME. *Verdict. Reasons therefor.* The jury must be presumed to have regarded the charge of the court, and if the conclusion arrived at does not otherwise appear erroneous, a juror will not be permitted to impeach his verdict by giving reasons for it.

6. SAME. *Communications to the jury.* A new trial will not be granted because the judge went to the jury room while they had charge of the case, and told them where he could be found if they agreed and wanted him; no injury resulting to the prisoner from such a statement. But it is better that no communication whatever take place between the judge and jury after the charge of the court, except in open court, and if practicable in the presence of the prisoner.

FROM TROUSDALE.

Appeal in error from the Circuit Court of Trousdale county. N. W. McCONNELL, J.

J J. TURNER, I. L. ROARK and McMURRY & HAMMOCK for Cartwright.

ATTORNEY-GENERAL LEA for the State.

DEADERICK, C. J., delivered the opinion of the court.

Plaintiff in error was convicted in the circuit court of Trousdale county of murder in the second degree for killing Hugh Sanders, and his punishment was fixed at fifteen years confinement in the penitentiary.

His motions for a new trial and in arrest of judgment being refused, he has appealed in error to this court.

The killing occurred in the county of Macon, and defendant was tried there and convicted of murder in the first degree, and sentenced to be hung. But upon appeal to this court the judgment was reversed for error in the charge of the court. Upon the cause being remanded to Macon county for a new trial, a change of venue was granted upon application of defendant, and the trial was had in Trousdale county, as above stated.

The cause has been ably and elaborately argued, and numerous grounds of error have been insisted on by defendant's counsel.

First, It appears when the cause was called for trial, that defendant's counsel understood that they were to be permitted to read the testimony of Asa Diaz, an absent witness, from the bill of exceptions taken in the former trial, and they state they would not have gone into the trial but for this understanding. They announced they were ready if permitted to read the former testimony of Diaz. But when said testimony was offered, the attorney-general objected, and it was excluded.

The court was willing to allow it to be read if the attorney-general would consent to it. But it is obvious that the attorney-general did not agree that it might be read on that trial, and the mere fact that the court directed the jury to be empanneled without indicating any dissent to the proposition of defendant's counsel could not bind the attorney-general

If deemed material evidence, the counsel for defendant should have had a distinct understanding with the attorney-general upon the subject, and the court cannot be put in error by their failure to do so. The evidence consisted in a threat by Sanders, who had a loaded gun, that if Cartwright charged him with stealing wine he would kill him. This threat made some time before the killing was never communicated to Cartwright, and of course could not, in any degree have influenced his conduct at the time of the homicide. Beside the defendant on the trial had the benefit of the testimony of numerous witnesses, proving similar threats, some of which were, and others were not, communicated to him.

Second, It is urged also that the circuit judge erred in handing to some of the jurors, before the argument of the cause, the written charge which he had given to the jury on the former trial. It appears that several of the jurors did inspect the first page of said charge. The object stated by the court to be, to have the charge copied in a plainer handwriting, if the jury were unable to read his writing with facility. The part of the old charge so inspected was the first page containing part of the definition of murder in the first degree. It was not handed to them as containing instructions by which they were to be governed in the trial of the cause, but merely to ascertain whether it would be expedient to have his charge written more plainly than he would write. No possible prejudice could have resulted to defendant from this.

Third and fourth. It is next objected that while the jury had the cause under consideration, two of the jurors, Belcher and Wiseman, were separated from their fellow jurors. The room which the jury occupied was above stairs in a hotel, and opened into a hall which led into a veranda. At an angle in this hall the officer sat, so that he could command a view of the door of the room occupied by the jury, and the door leading into the veranda.

It is important to a fair and impartial trial that the jury should not be permitted during the trial to mingle with other citizens. If this be permitted the possibility that the juror may have been tampered with exists, and *prima facie* the verdict is vicious. But this presumption may be removed by evidence showing that the juror had no such communication; 6 Baxt., 161. In *Hines* v. *The State*, 8 Hum., 597, it was held that the oath of the juror alone would not be sufficient to remove this presumption.

In the case of Wiseman it very satisfactorily appears, from his own affidavit and that of the officer having charge of the jury, that no such separation occurred. Belcher, in his affidavit, states that he was in the door leading to the veranda, and that the officer was with him, and that he had no communication with other persons. The officer swears that he has no recollection of being at the door of the veranda with Belcher. But he does say that Belcher could not have been there without his knowledge, nor had any of the jury, to his knowledge, any communication with other persons, except with the trial judge,

as. hereinafter mentioned.   Womack speaks of having seen Belcher from the opposite side of the street, standing on the veranda alone.   It is clear he was not in communication with any other person, as far as the witness, Womack, could see.   As far as appears this veranda was upon a level with the second story of the house having no other entrance than through the hall leading by the door of the room occupied by the jury.   No one could have been in communication with him upon the subject of the trial.   If a juror does wantonly separate himself from his fellows, probably the rule approved in 8 Hum., and other cases may not be too harsh.   But where it is affirmatively shown that no one was with the juror, with whom he could communicate, and that he was at no great distance from the other jurors and their officer, and where the officer says, although he does not recollect of seeing the juror at the door leading into the veranda, he could not have been there without his knowledge, and that he believes no outside party, except the judge, had any communication with them during their deliberations, the probability of such communication is too remote to warrant us in saying that defendant may have been prejudiced by the facts disclosed, in respect to his temporary separation from his fellows.

It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial:  4 Hum., 37.

Fifth, Nollner, one of the jury, stated upon his

affidavit, and upon examination, that he did not have the conversation detailed by W. G. and Wiley Hawkins and Henry Read, or if he had such conversation, he has no recollection of it. That he had heard before the trial that Cartwright had shot Sanders, while Sanders was sitting in a chair and doing nothing, and without cause; that he believed it, but did not know whether it was true, and that he never read the testimony in the papers, and that he had not formed or expressed an opinion before the trial.

One W. G. Hawkins says that Nollner said after the trial, that "it was not near so bad as he, Nollner, had heard it was before the trial."

Wiley Hawkins says that Nollner told him the same thing stated by W. G. Hawkins, to which affiant replied he did not see how he could have sat upon the jury, and Nollner said he could have kept off the jury but he was afraid the judge would ask him some questions he could not answer. Read says Nollner told. him after the trial he had read the evidence, but did not or could not have formed an opinion in the case.

It might be supposed from Nollner's own affidavit and examination, that he would have formed an opinion from the facts detailed. He states, giving the name of his informant, who does not appear to have been a witness in the case, that before the trial he was told that defendant had shot deceased without cause while sitting in a chair and doing nothing to him, and that he believed it, but that he did not know whether what was told was true. If he believes that

the statement made was true, undoubtedly he must have formed an opinion that some offense was committed. But in the same affidavit he says he had not *formed* or expressed any opinion before the trial.

It would seem, therefore, that he meant by saying "he believed what they told him," that he believed they were telling the facts as they had heard them, for he adds after expressing his belief, "but I did not know whether what they told me was true."

The statement of this juror that the facts were not as bad as he had heard they were, did not amount to an expression of an opinion as to his belief of those facts. And if those statements were made, which he denies, they do not constitute a disqualification to act as a juror, and his statement that he had read the evidence being accompanied with the declaration that he did not from it form any opinion would not render him incompetent.

Taking all the facts together the juror has not been shown to have formed or expressed an opinion before the trial. From his having been selected, the presumption is that he was competent, and his own affidavit since the trial, states that he had not formed an opinion, and he is a competent witness on this point: 5 Lea, 610. And there is nothing in the affidavits of Hawkins and Read to show that he had formed or expressed an opinion, however they may contradict him. A stronger case must be made after trial against a juror, in order to set aside a verdict than would be necessary to set him aside before selection: 3 Head, 375–7.

.Sixth, It is next objected that one of the jurors was of kin to defendant. It appears that their wives were of kin within the prohibited degrees, but neither the juror nor defendant knew it when the juror was accepted. This species of disqualificetion, *propter defectum*, must be taken advantage of before the jury is sworn, although the prisoner is ignorant of it: 1 Yer., 206; 8 Yer., 507; 1 Hum., 259; 4 Hum., 477. A different rule prevails where a juror has prejudged the case: 4 Baxt., 253; 1 Sneed, 219.

Seventh, One of the jurors states that they all agreed upon a verdict of guilty but divided on term of imprisonment; that he was for ten years, but finally agreed to fifteen 'to save further costs.

Such a reason for a verdict will not be entertained or considered. The jury must be presumed to have regarded the charge of the court, and if the conclusion arrived at does not otherwise appear erroneous, a juror will not be permitted to impeach his verdict by giving reasons for it.

Eighth, It is also urged that the judge erred in admitting the record in the case of State against Cartwright for larceny in stealing wine.

In this case Sanders was a witness against Cartwright, who was acquitted. The circuit judge instructed the jury as to the object in admitting the record, and showing that Sanders testified against Cartwright on the trial. He told them that it was only admissible to show a motive for unfriendliness towards Sanders and for the killing by Cartwright, and for no other purpose. Limited to this object, as was done,

the evidence might be admitted to be considered by the jury, as Cartwright was acquitted on the trial. The circumstances of this prosecution were shown by defendant's evidence, and threats made by Sanders proved, in connection with it.

Ninth, It is also objected that the trial judge, after he had delivered his charge, and while the jury were considering the case, passed by their room in the evening, and told them he was going home, and if they should agree they could send for him.

Strictly the judge had no right to enter the jury room and there speak to them about the case. It is more proper that all his communications with the jury should be had in open court in the presence of the prisoner and his counsel.

In 3 Wharton Am. C. L., sec. 3139, it is said that no communicatien whatever ought to take place between the judge and jury after the charge of the court, except in open court, and when practicable, in the presence of the prisoner. The cases cited are such as contain new matter by way of additional instruction on the merits of the case, or where they had been urged to agree. In this case nothing of this sort appears. The judge, for his own convenience and that of the jury, simply informs them where he can be found when wanted.

We cannot see how any injury could have resulted to defendant from such a communication. Numerous requests for further instructions were presented to the judge, chiefly upon the law of insanity. His Honor had already given full and accurate instructions upon

this subject. nevertheless he gave the additional in-
structions asked in part, and refused others upon the
ground that the jury had been already instructed fully
upon this subject.

We do not think that the court committed any
error in refusing a repetition of instructions already
given. The charge was already very long and full,
and ample for the guidance of the jury in the inves-
tigation of every material question arising in the case.
The facts fully warranted the jury in the verdict re-
turned by them.

The defendant deliberately loaded his gun with
slugs, sought the deceased, and found him sitting in
front of a hotel in conversation with others, utterly
unsuspicious of danger, when defendant stepped within
a few feet of him, and shot him.

There is no error in the record, for which the
judgment should be reversed, and it will be affirmed.