# GRAY *v.* STATE.

## (*Nashville,* December Term, 1951.)

### Opinion filed June 7, 1952.

236

Day Sugg and Lawson H. Myers, both of Fayetteville, for plaintiff in error.

NAT TIPTON, Assistant Attorney General, for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is an appeal from a conviction of voluntary manslaughter with a maximum sentence of seven years in the State penitentiary. The appellant, being the defendant in the trial court, will be thus referred to in this opinion.

The homicide, of which the defendant stands convicted, occurred at his home on the night of December 19, 1950, about midnight. Early in the evening of that day the defendant attended a Christmas dinner that was being given by a secret order, of which he was a member, and while there he met the deceased, William Lee Yearwood, Thornton Taylor and Howard Phagan. He knew all of them well and was on friendly terms with them. After having several rounds of liquor together and a game of "craps" they repaired to the home of the defendant about eleven o'clock p.m. It will serve no purpose to refer to the result of the crap game as to how much money was won and lost in this game. Before leaving the club the defendant telephoned a lady friend who resided in Lewisburg, a Mrs. Nadene Watson, and requested her to come to Fayetteville. She arrived a few minutes before the defendant and his companions. Her car was standing in the driveway when they arrived. When the party entered the house they at once repaired to the kitchen where

each, except Mrs. Watson, consumed a quantity of whisky. Thornton Taylor testified that the defendant invited the three to his home "to have a night cap" and to meet Mrs. Watson. The defendant had no recollection of inviting them. It appears, however, without dispute that Taylor rode in defendant's car to the latter's home while Phagan, who had no automobile, rode in the car with the deceased Yearwood.

Very soon after the drinks in the kitchen the party went into the living room where Taylor and the defendant started another game of craps. Phagan at no time participated in the game. On the contrary he and Mrs. Watson expressed a desire to go home. They insisted that the game should terminate and all of them should go home. The defendant objected, complaining that they were leaving the game while he was a loser. There is evidence to the effect that he became angry, that he quit the game and ran into a bedroom for a pistol. At this moment Mrs. Watson screamed that he was going to get a gun. Every member of the party apprehended that danger was imminent as evidenced by the fact that they fled from the room immediately. Both Taylor and Phagan tried to leave by the front door, while Mrs. Watson left through a back door. Phagan retraced his steps and finally made his exit out of the house to the rear with Mrs. Watson. The deceased Yearwood, in some way not clearly shown in the record, left the house. It is shown without dispute that the defendant procured a revolver and followed Taylor to the front door. Taylor testified that he fully realized that if he ran that he would be shot in the back; he thereupon stood in the doorway and begged the defendant not to shoot him. To all of his pleading, which lasted several minutes, the defendant

made no response, except to shoot him. When he had fallen to the floor of the front porch, the deceased Yearwood appeared and offered to aid him. It was at this time that defendant fired upon Yearwood, from which wound he died ten days thereafter.

Immediately following the shooting of Taylor and Yearwood the defendant took Taylor's hat and crushed it down over his face. The driver of an ambulance had to remove the hat to ascertain Taylor's identity. That Phagan was later shot and seriously wounded by defendant is not a matter of doubt although he testified he did not know who shot him.

The shooting occasioned much excitement in the neighborhood. When city officers arrived upon the scene, they testified that the defendant made the statement he intended to kill all of the sons of bitches.

The deceased was removed to the hospital and given emergency treatment as were the other men, Taylor and Phagan, who were in a very serious condition. The deceased suffered from three flesh wounds, not thought to be fatal, but of sufficient gravity to require an operation and blood transfusions. The shock seems to have produced dangerously low blood pressure which resulted in interference with the proper functioning of the heart and kidneys. The immediate cause of his death was uremic poisoning.

The defendant testified he had no recollection of the shooting; that he had only a faint remembrance of what occurred at the club, but denied asking the deceased and others to go to his home; that he was so thoroughly under the influence of whisky that it was impossible to give any detailed account of his actions. He remembered having taken a drink in the kitchen and the crap game in the

living room; that while the game was in progress he noticed that one of the dice had two aces on it and when he complained about crooked dice both Taylor and the deceased Yearwood "slapped him". At this point he claimed that his mind "blacked out" and he remembered nothing more about the occurrences of the evening until after he was taken to the County Jail. On cross-examination he denied shooting the deceased because of being slapped.

The testimony of Mrs. Watson was in substance that the men became involved in a quarrel about the dice which resulted in a fight; "I mean they started pushing and passing licks, all three of them"; that she and Mr. Phagan pleaded for them to stop, and when Taylor made an effort to strike defendant with a coffee pot the latter "started to the bedroom". "I said 'He is going to get a gun, get out of here.' "

The foregoing was all the proof as to events leading up to the homicide. The defendant introduced his father and former wife who claimed that he would go all to pieces when he was under the influence of whisky. He was committed to a Memphis Hospital for observation. But the report fails to show any impairment of mind.

■ There is no evidence in the record that the defendant was of unsound mind. While there was a special plea of temporary insanity this issue was found by the jury to be without merit. There is material evidence to disprove the defendant's theory that he "blacked out". We think the evidence sustains the verdict of voluntary manslaughter. When the evidence of all the witnesses is given the fairest consideration the foregoing conclusion is inescapable. It is not possible, from the record before us, to find any excuse for this homicide.

All the assignments of error based upon the evidence are overruled.

██ It is next insisted that the trial judge committed error in bringing the defendant to trial in that there were pending two indictments for the same crime. The grand jury returned an indictment on February 13, 1951, charging the defendant with the murder of William Lee Yearwood and on February 22, 1951, the second indictment was returned for the same homicide. The record shows that on June 25, 1951, the day upon which the defendant was put to trial a *nolle prosequi* was entered as to the first indictment. We find no merit in the foregoing contention. Had the defendant gone to trial upon an indictment for the murder of Yearwood and proceeded to a verdict and judgment of the court, the legal effect upon all other indictments for the same crime would have been to nullify them. A plea of former jeopardy as to such other pending indictments would have been available to the defendant and conclusive against the State's right to a further prosecution. This assignment is overruled.

██ It is next assigned as error the action of the trial judge in overruling and disallowing the defendant's plea in abatement to the indictment because (1) the names of grand jurors were illegally drawn from the jury box by the Jury Commission and for this reason the grand jury was unlawfully impaneled; (2) that the trial judge erred in directing members of the Jury Commission that they need not answer questions of counsel as to the manner of drawing the names of prospective jurors.

The assignment must be overruled for the following reasons: (1) there is no entry upon the minutes of the court showing the action of the trial judge upon said

plea, and (2) we cannot look to the bill of exceptions to determine the question. We are not left in doubt as to this assignment. In *Diamond* v. *State,* 123 Tenn. 348 363, 131 S. W. 666, 669, it was held:

"The minutes of the court, as sent up, show no action by the trial judge upon the plea in abatement, and this matter need not be further considered. We cannot look to recitals in the bill of exceptions upon this subject."

■■ Moreover we think the plea was filed too late. The record shows that it was not filed for at least three weeks after knowledge of irregularities complained of. While the plea states that it was filed at the first opportunity, and within the three week period, it is more or less uncertain as to when, during that time, the irregularity was actually discovered. The case of *Chairs* v. *State,* 124 Tenn. 630, 644, 139 S. W. 711, 714, is well nigh conclusive of the question. In that case ten days had elapsed after knowledge of irregularities and was disallowed. The Court said:

"This paper contains no fact or statement showing why it had not been offered·earlier, during the preceding eight or nine days, or why no earlier objection had been made to the constitution of the grand jury. * * * The plea must exclude, by proper allegations and averment, every legal intendment or conclusion that otherwise might be made against it by the court. It must appear from its averments to have been filed at the earliest possible time. * * * And the rule is general that the greatest strictness prevails in the construction and application of pleas in abatement. They must possess the highest degree of certainty known to law in every particular." Citing cases.

The next assignment of error complains of the refusal of the trial judge to permit Dr. W. C. Holland to testify, using the hospital chart of the deceased Yearwood as the basis for an opinion, that the deceased died from uremic poisoning which proceeded from damaged kidneys, such condition resulting from low blood pressure; also that the attending physicians and surgeons neglected the deceased in that they failed to bring him out of shock. Answering questions asked by the court, he stated: "The initial wound was the initiating process." (Tr. p. 367.) "It was one of the factors that ultimately led to the patient's death." (Tr. p. 362.) In the absence of the jury Dr. Holland reviewed the chart and expressed the opinion that the immediate cause of death was uremic poisoning. We find nothing, however, in the testimony of this witness that would tend to exonerate the defendant from the charge of murder. Moreover it appears from the testimony of Dr. T. A. Patrick that the injured kidney and weakened heart "was all the result of the gunshot wounds." (Tr. p. 251.) "In my opinion if he hadn't been wounded he would be living today." (Tr. P. 252.)

We do not think the trial judge was in error in excluding Dr. Holland's testimony. The great weight of authority supports the State's contention that one who assaults another with a deadly weapon without justification, and death ensues, will not be permitted to relieve himself from criminal liability on the ground that the deceased was not given proper medical attention. In Wharton on Homicide (3rd Ed.), pp. 40 and 41, it is said: "To warrant the escape of the person inflicting the injury from responsibility for the killing, the subsequent neglect or mismanagement must have been the sole cause of death."

In *Odencal* v. *State,* 128 Tenn. 60, 68, 157 S. W. 419, 421, the contention was made that the surgical operation caused the death of the deceased and not the gunshot wound. In response thereto the Court said:

"The rule on this subject, supported by the weight of authority, is that, to exonerate the accused from the charge of causing death by a dangerous wound unlawfully inflicted, it must appear, not only that the operation was performed in a grossly negligent and unskillful manner, but also that it was the sole cause of the death, and not one of a series of intermediate causes, following in the train of the injury, the original cause. One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause. One of these dependent occurrences is the necessity of surgical aid, which may eventuate as the immediate cause of death." Citing numerous authorities.

In the light of the undisputed facts and the foregoing authorities the trial judge was correct in excluding the charts of the hospital. The effect of this hospital record and Dr. Holland's testimony was an attempt to set up a rule of criminal responsibility that was contrary to law. The cases cited by counsel for the defendant have no application. The assignment is overruled.

██ In the defendant's motion for a new trial the court's attention was challenged to the alleged misconduct of the jury in that they separated during the trial, three of them remaining locked up in their room without an officer, while the remaining jurors in charge of an

officer attended a picture show or ballgame. The three jurors were positive in their statements to the court that they were locked in their room at the jail on the second floor; that they slept soundly during the absence of their fellow jurors and that no one conversed with them. The insistence is made that since there was a possible opportunity to converse with them the verdict was thereby vitiated. To this we cannot give our assent. All the evidence shows that there was no possibility of any person conversing with them from a second story window, or in any other manner. They were as secure from contact with the outside world as if an officer had been present and standing guard over them. See *Cole* v. *State,* 187 Tenn. 459, 215 S. W. (2d) 824; and *Kennon* v. *State,* 181 Tenn. 415, 181 S. W (2d) 364. The assignment is overruled.

The argument is advanced by counsel that the defendant was acting in defense of his home and under the authority of *State* v. *Foutch,* 96 Tenn. 242, 34 S. W. 1, and *Winton* v. *State,* 151 Tenn. 177, 268 S. W. 633, the case should be reversed. These cases have no application here. There is no evidence in the record upon which to base the claim that the defendant was defending either his home from intruders or his person from great bodily harm.

Contention is made that the defendant was denied a fair and impartial trial because of the prejudice and bias of a juror (John Anderson) in that he stated to one or more of his fellow jurors "that R. D. Gray, father of the defendant, was a good man and his friend but that James Gray, defendant, was mean and had stopped his brother-in-law on the road and cursed him for something he was not guilty of." (Tr. pp. 40A and 41A.) The only

jurors who claimed to have heard the remark were J. N. Good, J. C. Pepper and E. H. Wade, and each testified it did not influence their verdict. The juror, John Anderson, testified that when the question of the defendant's sanity, or mental status, was being discussed he stated "that he was not insane the morning he accused my brother-in-law of hitting his car the night before." He was positive that he had no prejudice against the defendant and decided the case "strictly by the evidence." Other jurors testified they did not hear the remark complained of. While the remark was improper it appears from the sworn testimony of all the jurors that it was given no consideration whatever in deciding the case. We cannot help but be impressed with the fact that such was the case because the verdict itself does not reflect any bias or prejudice. While juror Anderson at first favored a more severe penalty he agreed to the lesser offense of voluntary manslaughter. We think the undisputed evidence would have justified a conviction of second-degree murder. In these circumstances the trial judge will not be put in error for refusing a new trial.

 The next assignment complains of improper argument by one of the State's counsel that defendant "was mean and low down and an ex-convict and that he had brought death to the mother of the deceased and gray hairs to his father." This statement was made in the opening argument. One of defendant's counsel stepped up to the bench and requested the court to instruct the jury to disregard it. The trial judge promptly instructed the jury not to consider it. Referring to the objectionable argument of counsel the following appears of record in the motion for a new trial:

The Court: "As to his argument and the statements he made which were in reference to the gray

hairs of the widow, the white hair of the father, and the death of the deceased mother of William Lee Yearwood, and I did tell the jury to dismiss that and to disregard that and had I known or had any idea that you wanted to object to it, I would have given them that instruction, but after I had given them that instruction no additional request was made.

"Does that cover it Mr. Myers?

Mr. Myers: "Yes.

The Court: "Mr. McCown did not know any objection was made and was not given any chance to correct it." (Tr. p. 839.)

The assignment is not well made and does not warrant a reversal of the case.

 Contention is made that the trial judge committed error in permitting the witnesses, Thornton Taylor and Howard Phagan, to make detailed statements about the defendants shooting each of them, on the ground that he was not being tried for any offense other than the killing of the deceased Yearwood. We hold that their testimony was admissible as a part of the res gestae, and also as reflecting on the defendant's state of mind. It was competent to prove everything that transpired, both at the club when the parties first met and at the home of the defendant. This assignment is without merit and is accordingly overruled.

 It appears from the record that shortly after the homicide counsel for the State took a shorthand statement of Mrs. Watson in which she undertook to detail what occurred at the time of the shooting. Following her testimony the State was permitted to read this statement as an impeachment of her testimony in the case. Since it contained statements that were wholly inconsistent

with her testimony, it was proper for the State to offer it in rebuttal. We think it was unnecessary for the State's counsel to give notice to opposing counsel of their intention to take this statement.

It is next insisted that the trial judge committed error in allowing the State to introduce proof in rebuttal that Taylor and Phagan were not drunk at the time the three men were shot by the defendant. We think it rested entirely within the discretion of the trial judge. *Hughes* v. *State,* 126 Tenn. 40, 148 S. W. 543. Upon this authority the assignment is overruled.

Finally it is insisted that the cross-examination of the defendant was improper and prejudicial. Certain questions were asked him by the State's counsel, if he had not been convicted at different times for offenses involving moral turpitude. The questions were not propounded in an effort to establish other crimes, but for the purpose of testing the credibility of the defendant as a witness for himself. It is well settled that when a defendant takes the witness stand in his own behalf he is subject to the same methods of cross-examination as an ordinary witness. *Keith* v. *State,* 127 Tenn. 40, 44, 152 S. W. 1029; *Zanone* v. *State,* 97 Tenn. 101, 36 S. W. 711, 35 L. R. A. 556; and *Gray* v. *State,* 191 Tenn. 526, 235 S. W. (2d) 20.

We find no reversible error in the record, and the assignments of error which have been given full consideration are overruled. The judgment of the trial court is affirmed.