Jack T. WADE, Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

Jan. 29, 1975.

Certiorari Denied by Supreme Court
May 12, 1975.

Boyd W. Cox, Knoxville, Dale Quillen, William C. Wilson, Nashville, for plaintiff-in-error.

Milton P. Rice, Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., John R. Lodge, Jr., Research Asst., Nashville, Ronald A. Webster, Dist. Atty. Gen., Ralph A. Harwell, James L. Jones, Asst. Dist. Attys. Gen., Knoxville, for defendant-in-error.

## OPINION

O'BRIEN, Judge.

Appeal in error from judgment on jury verdict finding defendant guilty of selling heroin and fixing his punishment at not less than five years nor more than seven years in the State Penitentiary.

On this appeal defendant first assigns as error that members of the jury improperly separated during the course of the trial and were not kept under surveillance during the separations.

This has been a very interesting case, ably and competently presented and defended in the trial court, which has provoked a good deal of research in considering the assignments of error and in determination of our decision on the assignments.

Defendant bases his argument to support the first assignment of error on the case of *Hines v. State*, 27 Tenn. 597, which was considered by our Supreme Court more than one hundred years ago. He cites several of the more recent decisions in this state on the subject as authority for the proposition that there has been no departure from the rule stated in Hines.

In reviewing this theory we have read all of the cases cited by defendant as well as a number of others, including several decisions which preceded Hines. A recitation of the facts surrounding the separation of the jury in this case is necessary to a discussion of these cases.

On the second day of the trial when the court reconvened, and before the jury returned to the court room, counsel for the defendant stated to the court that in walking from his hotel to the Court House, as he arrived at a parking lot just above the Court House, he observed three members of the jury coming from the parking lot. They were not in the custody of any officer assigned by the court to attend the jury. Counsel walked behind these jurors to the Court House and there observed the other male members of the jury coming up the stairs. The female members of the jury were also entering the Court House in the custody of their officer. Upon receiving this report the trial judge commented that it was necessary to house the jurors where adequate housing could be obtained for them and it was necessary for them to take their cars to go to a motel to spend the night. He stated he would explore the matter further at a later time and overruled a motion for mistrial. The jury was then called and the trial proceeded.

After the jury verdict was returned, judgment was entered by the trial judge, other procedural matters consummated, and the jury dismissed. The trial judge then conducted an investigation of the matter by examining the court officers assigned to attend the jury as well as each of the jurors independently. The male court officer was sworn and stated he had attempted to take charge of the jury in conformance with his oath. He had housed them at the Town Lodge Motel. Mrs. Ora Norris was the matron in charge of the ladies, and she was present at the motel. When court was adjourned at approximately 7:30 the previous evening, the court officer took seven of the jurors in his personal car. They proceeded

to the vehicles owned by these jurors. This group was assembled with their respective vehicles and then went to the motel. Mrs. Norris took the other men and the women jurors to an all night garage in the vicinity to obtain their car keys. When the officer arrived at the motel this second group was already there. The jury was checked into the motel before they were taken to dinner at the Carriage House which was next door to the motel. The officer arranged to have the vehicles of all of the jurors parked on the Hill St. viaduct in the morning and to have them served breakfast at the Hyatt House, both places evidently being in the vicinity of the Court House. This arrangement enabled him to have the jury in the Court House by 8:00 o'clock in the morning. He had instructed each of the jurors to follow him and park their cars on the viaduct. The drivers of two cars did not follow these instructions and went directly to the Hyatt House parking lot. One of these vehicles contained three men jurors and the other one, two women jurors and the matron. The officer's explanation for these events was that one of the lady jurors had refused to follow the matron's instructions to park on the viaduct, insisting she would park in the Hyatt House parking lot as she normally did when she came to town. He did not know where the three men parked when they came from breakfast to the Court House. He did not observe any strangers talking to any member of the jury from the time they left the Court House at the conclusion of the first day of trial until they arrived back there on the following morning. One stranger in the motel lounge made inquiry about what the officer would do if he attempted to talk to some of the jurors and was informed in somewhat basic language that he would be placed in jail. No one to his knowledge talked to any of the jurors.

The matron was sworn and testified that after they left the court at the end of the first trial day one of the male jurors took her and the two lady jurors to obtain their

car keys. He let them out of his automobile and drove away. They then obtained the car keys and drove together in one vehicle to the Town Lodge Motel, where they waited in the lobby until the other court officer came. They then went in a body to eat after which they returned to the motel. The court officer requested all of the jurors to park their cars on the Hill St. viaduct in the morning. The following morning the lady juror who was driving said she could see no point in leaving her car on the viaduct and walking three blocks. She ignored the court officer's instructions and drove to the assigned eating place and parked in front. When they walked in the matron found three of the men jurors waiting for them. The lady juror went into the dining room and directed the personnel there to set up fourteen places, ignoring the admonition of the matron not to do so. When they returned to the Court House from breakfast the lady juror parked her vehicle where it had been parked on the first day of the trial. When they returned to the Jury Room they saw three of the men jurors standing in there with no officer in attendance on them. To her knowledge no one other than the officers talked to any member of the jury and she did not observe any strangers in the presence of any of the jurors at any time when they were in her sight.

Juror Goodman testified he was never out of the presence of the attending officer on the first day of the trial. On the morning of the second day he followed the officer from the motel to the assigned eating place. On the way from the restaurant to the Court House they became separated. He rode from the viaduct on Hill St. where he had parked his truck to the Hyatt Regency with Juror McBee and Juror Donald Hall. During the entire course of the trial he did not discuss the case with anyone other than his fellow jurors.

Juror Donald Hall confirmed that he had ridden with Goodman in Juror McBee's car and that these three had been at the Court House and had waited in the Jury Room three or four minutes before the remainder of the jury arrived. He had not had any discussion with anybody about the case except his fellow jurors.

McBee said he, Goodman, and Donald Hall came from the restaurant to the Court House by themselves in his car after breakfast. They drove to a parking lot on Gay St. and walked from there to the Court House. They were not separated at any time. They preceded the other jurors to the Court House by about five minutes. The night before the jurors drove separate automobiles to the motel, arriving at approximately the same time. He had not had any conversations with anyone other than the other jurors and the court officers about the case.

Juror Goehring says he took the two lady jurors and the matron to pick up the car keys the night before. One of the lady jurors rode with him to the motel while the matron and the other female juror followed him in her car. All of his discussions about the case had been exclusively with his fellow jurors. To his knowledge none of the jurors had talked with any strangers or outsiders. All the rest of the jurors had been in the company of one or more of the other jurors for the entire time the court was in recess. They had not communicated with anyone other than their fellow jurors other than when the two lady jurors did not follow the instructions of the officer in charge of the jury while going to breakfast. They were never out of the presence of the matron who was in attendance upon them except en route to the motel for their nights lodging when one rode with a fellow juror and were followed by the female officer and the other lady.

After the trial judge concluded his examination of the court officers and all of the jury he stated that unless it could be shown some person had tampered with the jury there would not be any grounds for complaint.

At the conclusion of the argument on the motion for new trial the trial judge made an extensive finding of facts in regard to the various grounds which had been alleged. In reference to the matter of the separation of the jury he stated that it was necessary to make arrangements to house the jury in a motel out on the Chapman Highway. Prior to the trial of this case to his knowledge no problem had occurred in having the jurors and their respective automobiles keep in sight of each other and their officers en route. As a result of receiving the report that the jurors were separated in this case he had interrogated each of the jurors in regard to their activities in staying together overnight, and in proceeding to breakfast and return to the Court House the next morning. The procedure in traveling to the motel was satisfactorily explained. Each of the jurors stated he had not talked to anyone other than another juror nor had they observed any juror talking to anyone outside the jury. The trial judge expressed his confidence in the character of the jury and his reliance on his belief that they would not commit perjury under oath. Each of them had stated under oath that no one had tried to influence them or try to talk to them, nor did they talk to anyone, all their conversations and communications had been with fellow members of the jury panel, and each one had stated that they based their decision upon the evidence and upon the law given to them by the court. Based on these facts and the case law as he construed it, it was his opinion there were no errors in the trial procedure and the facts did not warrant overturning the jury verdict.

It is quite clear to this court that *Hines v. State*, 27 Tenn. 597, (1848), which cites several of the earlier cases on the subject, stands for the proposition, relied on by defendant, as follows:

"1st, that the fact of separation having been established by the prisoner, the possibility that the juror has been tampered with, and has received other impressions than those derived from the testimony in Court, exists, and *prima facie* the verdict is vicious; but 2d, this separation may be explained by the prosecution, showing that the juror had no communication with other persons, or that such communication was upon subjects foreign to the trial, and that, in fact, no impressions, other than those drawn from the testimony, were made upon his mind. But, 3d, in the absence of such explanation, the mere fact of separation is sufficient ground for a new trial."

In considering this matter in Hines, supra, our Supreme Court referred to the earlier cases of *McLain v. State*, 18 Tenn. 241, and *Stone v. State*, 23 Tenn. 27, in which the above principles were discussed. While the rule stated in those cases has been followed in this State it is plain, upon a reading of later cases that, due to changing circumstances in our mode of living, this rule has experienced some modification. In *Cartwright v. State*, 80 Tenn. 620, it was reported that two of the jurors had separated from their fellows. In the case of one it appeared from his affidavit, and that of the officer having charge of the jury, that no such separation occurred. There was some conflict in the evidence about the other juror, but it appears that at the most he may have been on the second floor veranda of the hotel where the jury was quartered and there was no evidence that he was in communication with any other person. In that case our Supreme Court had this to say:

"If the juror does wantonly separate himself from his fellows, probably the rule approved in 8 Hum. (Hines v. State, supra), and other cases may not be too harsh. But where it is affirmatively shown that no one was with the juror, with whom he could communicate, that he was at no great distance from the other jurors and their officer, and where the officer says, although he does not recollect of seeing the juror at the door leading into the veranda, he could not

have been there without his knowledge, and that he believes no outside party, except the judge, had any communication with them during their deliberations, the probability of such communication is too remote to warrant us in saying that defendant may have been prejudiced by the facts disclosed, in respect to his temporary separation from his fellows."

"It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial: 4 Hum., 37." (Stone v. State, supra).

In *Sherman v. State*, 125 Tenn. 19, 140 S.W. 209, the jurors were apparently separated but each of the separate groups were accompanied by one of the court officers in charge. In that case there was an extensive review of the earlier cases. The thrust of the opinion by Justice Green seems to be that the rule to be followed was that a separation of the jury may be explained by showing that those separated had no communication with other persons or that such communication was upon subjects foreign to the trial; and that the additional rule, well established at that time, was that findings of fact made by the Circuit Judge on a motion for new trial, where there is any evidence to sustain them, are binding upon the appellate courts.

In *Long v. State*, 132 Tenn. 649, 179 S.W. 315, there was a total separation of the jury without an officer by agreement between the attorney general and the defendant and his counsel. The Supreme Court said that under circumstances where the conduct of the jury during the separation was wholly unexplained the verdict of the jury was *ipso facto* vitiated. However, it was also said that this ruling under the circumstances of the case was not to be taken as in conflict with those where a separation of the jury has occurred, but it appeared that the verdict of the jury was unaffected by the separation. Finding no such showing in the transcript which could save the verdict, the case was reversed.

In *Hickerson v. State*, 141 Tenn. 502, 213 S.W. 917, a juror was temporarily excused by the court because of the illness and subsequent death of his child. The juror remained at his home a portion of two days and one night in the presence of a court officer. He was separated from the court officer several times during this interval and, it appears, may have talked with others. The officer testified he did not think anything improper occurred, and he did not think the juror talked with anyone except his wife. Although the Hickerson judgement was remanded for a new trial the significance of the opinion in that case is the reference to Chapter 32 of the Acts of 1911, now incorporated in the Statutes as T.C.A. Section 27–117. There is no doubt that the Supreme Court expresses the view that the separation of a jury may be considered as harmless error under some circumstances:

"Nor do we think chapter 32 of the Acts of 1911 can be applied here. The act of 1911 is to be invoked only where this court can look to the merits of the controversy. Where the whole case is before us and we can see that the merits have been reached, there will be no reversal for errors not affecting the merits."

As stated in *Kennon v. State*, 181 Tenn. 415, 181 S.W.2d 364:

"The plaintiff in error makes no specification of prejudice to support the assignment of error and we can find no such prejudice after reviewing the record, . . . ."

In *Cole v. State*, 187 Tenn. 459, 215 S.W.2d 824, under circumstances very similar to those in this case, there were no accommodations available at the local hotel and the jury, attended by only one officer were taken in two taxi cabs to a motel where part of the jury slept in the same room with the officer, and the other mem-

bers slept in an adjoining room. Our Supreme Court had this to say:

". . . on the hearing on motion for a new trial 11 of the jurors, who were able to testify what happened to all 12 members of the jury, testified positively that no outsider had discussed the trial with any member of the jury, and that no improper outside influence had been attempted or exerted.

When it thus affirmatively and conclusively appears that the defendants suffered no prejudice by the mere technical separation of the jury as under the necessities of the case here, the enforcement of the rule is unreasonable and will not be required. 'The purity of jury trials is now made to depend not on form, but substance.' *Stone v. State*, 23 Tenn. 27, 38. It is true that defendants raised a presumption against a fair trial when they showed the separation of the jury, but the State overcame the presumption by the positive testimony of the 11 jurors, and the corroborating testimony of the officer, and by the circumstances of the separation. *Odle v. State*, 65 Tenn. 159, page 161, Rule 2.

Our cases, as well as those from other jurisdictions, make it clear that it is not the mere physical separation that is frowned upon, but it is the opportunity thus afforded the jury of mingling with outsiders while not under the eyes of the attending officer. There is no proof in the present record that any outsiders were in contact with the jury while any of its members were unattended by the officer. In such case there was no prejudice to the rights of the defendants and no error." (Citations omitted)

The rule as stated in Cole, supra, was followed in *Gray v. State*, 194 Tenn. 234, 250 S.W.2d 86. In *Steadman v. State*, 199 Tenn. 66, 282 S.W.2d 777, our Supreme Court reviewed the various authorities, most of which we have touched on in this opinion, and reiterated that the rule stated in Hickerson, supra, was sound, and that

the harmless error statute did apply in cases of this nature. The harmless error statute is also considered in *Smith v. State*, 205 Tenn. 502, 327 S.W.2d 308, in reference to the separation of a jury.

 We are of the opinion that the trial judge would have been justified in finding in contempt the lady juror who deliberately defied the instructions of the attending court officer in regard to the procedure for going to breakfast on the second trial day. However, as stated in the more recent cases which we have discussed, there has been no showing of any prejudice as the result of the separation of the jury. We have carefully read this entire record and are satisfied that the evidence presented and accepted by the jury was clearly credible and preponderated in favor of defendant's guilt. In the absence of a showing of prejudice in the separation of the jury we hold that the separation, as brought out by the trial judge in his investigation, must be held to be harmless error, and we are bound by his finding of fact in the matter.

 It is assigned as error that defendant was denied due process because of a delay in bringing the presentment; and that he was denied his right to a speedy trial.

According to this record the offense for which defendant was convicted occurred on April 12, 1972. The presentment by the grand jury was returned on October 31, 1972. Defendant was not arrested until January 20, 1973, and was released on bail two days later. His trial was set for March 27, 1973 and the record does not disclose why the case was not proceeded with on that date. On May 11, 1973, an order was entered adding the name of an additional witness to the indictment. On July 25, 1973, motions were filed for psychiatric evaluation and to dismiss the cause because of denial of a speedy trial. On July 26, 1973, the motion to dismiss came on for a hearing and was overruled. Defendant's

motion for psychiatric examination at State expense was overruled but he was allowed additional time in which to make arrangements concerning private psychiatric examination. On that date the case was reset for trial on October 10, 1973. There is no indication in the record why the trial was not held on that date. The case ultimately came to trial on November 29, 1973.

Defendant says the delays, as related heretofore, resulted in a great deal of difficulty in remembering his actions or his whereabouts on April 12, 1972, because he had suffered a psychiatric illness in the interval between the alleged criminal act, the date of his arrest, and the eventual trial date.

The record indicates that the delay between the presentment and defendant's arrest resulted, in some degree, because defendant could not be located for some length of time. It would also appear that the assertions of prejudice are somewhat diluted by the fact that defendant endeavored to obtain a further continuance on the trial date. He argues that his defense alibi was impaired by his inability to reconstruct his exact whereabouts on the date the offense occurred. However, his alibi defense was corroborated by the testimony of his brother, and his mother. It would seem that the proof offered by these witnesses carried as much weight as testimony of the defendant which could be no more than cumulative of what they had to say about the matter. There were serious discrepancies in their testimony as well as that of the defendant which was brought out in cross-examination by the State. The jury had the benefit of all of this testimony and has resolved those discrepancies by their verdict. The contentions raised by this assignment were resolved in *Halquist v. State*, Tenn.Cr.App., 489 S.W.2d 88, and the assignment must be overruled. Also see *State v. McCullough*, 4 Tenn.Cr.App. 272, 470 S.W.2d 50, and *Beard v. State*, Tenn.Cr. App., 485 S.W.2d 882; *Farr v. State*, Tenn. Cr.App., 506 S.W.2d 811; *Marion v. United States*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468.

There were two eye witnesses to the sale of the heroin to a T.B.I. agent. Both positively identified the defendant in court as the individual making the sale. Defendant relied on an alibi defense through his own testimony and that of his relatives in an effort to show he was elsewhere on the date of the offense. There was ample evidence to justify the jury in reaching the conclusion which they did.

We have heretofore stated that our review of this record satisfies us that the evidence introduced at the trial does not preponderate against the verdict and in favor of defendant's innocence and the final assignment must also be overruled.

Finding no error in the conduct of the trial proceedings the judgment is affirmed.

WALKER, P. J., and RUSSELL, J., concur.