IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. FREDERICK  EDWARD BRAXTON
AND LEONARD CARDELL HARRIS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-A-732      Steve R. Dozier, Judge**

---

**No. M2009-01735-CCA-R3-CD - Filed August 26, 2011**

---

The Defendants, Frederick Edward Braxton and Leonard Cardell Harris, were indicted for attempted premeditated first degree murder.  Additionally, Defendant Braxton was charged with possession of marijuana, which was severed as unrelated. Following a jury trial, Defendants were convicted of attempted second degree murder.  Defendant Braxton was sentenced to serve nineteen years in confinement as a Range II offender, and Defendant Harris was sentenced to serve eleven years in confinement as a Range I offender.  On appeal, both Defendants argue that (1) the evidence was insufficient to support the convictions, and that the trial court erred in denying their motion for judgments of acquittal; (2) the trial court erred in precluding Defendants from questioning the victim about being previously shot in a home burglary and about the victim's prior arrest sixteen months before the shooting; (3) their sentences are excessive; and (4) trial counsel were ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton argues that the trial court erred in allowing the jail custodian of records to testify in rebuttal concerning Defendant Braxton's period of confinement in the Davidson County jail;(b) trial counsel was ineffective for (i) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of the convictions; (ii)  failing to amend the original notice of alibi, filed by previous counsel, to include an additional witness; (iii) failing to investigate possible defenses and alibi witnesses; (i.v.) failure to adequately meet with Defendant Braxton and prepare for trial.  Defendant Harris argues that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris which opened the door to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim.  After careful review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

George J. Duzane and Dominic J. Leonardo, Nashville, Tennessee (on appeal), and Lee Sprouse and Ashley Preston, Nashville, Tennessee (at trial), for the appellant, Frederick Braxton.

William E. Griffith, Nashville, Tennessee (at trial and on appeal), and Karl Pulley, Nashville, Tennessee (at trial), for the appellant, Leonard C. Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; J. Wesley King, Assistant District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### State's Proof

On February 15, 2006, the victim, James Williams, was working at East Nashville Auto Sales located at 1413 Dickerson Pike. On that day, he noticed a car traveling down the street with "one of the defendants' brother in it." The victim did not think anything about it and continued "what [he] was doing at the time." He left work around 5:00 p.m. and drove toward downtown Nashville on Dickerson Pike, a four-lane road, to pick up his girlfriend. As he was driving in the left lane, the victim noticed "a green early nineties model - - uh - - Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim testified that he closed his sunroof "thinking that if [he] shut the sun roof the car would be dark and they wouldn't know who was in it, that they wouldn't open no fire on the car." He then moved into the right lane of Dickerson Pike in an attempt to get to the interstate and lose the other vehicle. The victim testified that when he stopped in traffic, the green car pulled up beside him with "two men hanging out the car shooting." He recognized the two men as Defendant Braxton and Defendant Harris whom he had known since the early 1990's, and their relationship was one of "bad blood." Although there were four people in the vehicle, the victim could not identify the other two. He said that Defendant Harris was in the front and Defendant Braxton was in the back. Both men were on the passenger's side of the car.

Upon realizing that he had been shot, the victim played dead and after the Defendants left, he drove to the AM/PM Market on North First Street and asked a lady there to call 9-1-1. He testified that he had been carrying a .40 caliber handgun at the time of the shooting

that he tossed in a trash can before entering the market. The victim was then transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. The victim testified that one of the bullets struck him in the upper arm. He said:

> It went through the back and came out there. They had to put a metal plate right here . . . straight through in and out right here. It went through my - - one bullet went through my hand and lodged in my wrist, one in my finger and one in my mouth. And, it knocked my teeth out.

The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose. He said that he lost six teeth, and there were sixteen bullet holes in his car as a result of the shooting.

The victim testified that he received a visit from Detective Bradley at the hospital shortly after coming out of surgery, and he told Detective Bradley that he did not want to talk about what happened. The victim said that he intended to handle the situation himself but changed his mind after speaking with his mother who told him to think of his family and the pain that he would cause them by taking matters into his own hands. The victim testified that he spoke with Detective Bradley a second time and told him that Defendants Braxton and Harris shot him. Detective Bradley later returned to the hospital with photographic line-ups, and the victim identified each Defendant. The victim admitted that he had previously been convicted of several criminal offenses. He further admitted that because he was a convicted felon, he broke the law by possessing the 40-caliber handgun at the time of the shooting.

The victim testified that after one particular court appearance on August 18, 2006, he saw Defendant Harris outside the courthouse. He made eye contact with Defendant Harris who said, "I'm gonna get you boy. So, be ready." He said that Defendant Harris then walked down the drive talking to his family and making gun-like gestures.

On an occasion prior to the shooting which is the subject of this case, the victim testified that in October of 2005, he arrived home around 1:30 or 2:00 a.m., and as he was walking through the breezeway to his residence, Defendant Harris and another individual opened fire on him. One of the bullets struck him in the foot. The victim testified that he shot at a third man who ran from the side of the building. He then hid under a neighbor's Jeep until Defendant Harris and the other men left. The victim testified that his sister called police, and when they arrived, he told them that everything was fine and that he would "handle it." He also told police that he did not know who shot at him. He said that he did not want police searching his house because he had two firearms on his person, and there

were additional assault rifles in his home. The victim testified that he had driven by Defendant Harris' beauty shop prior to the incident.

Kenneth Miller testified that he left work on February 15, 2006, and dropped a passenger off at Dunlap and Kyle Tire on Dickerson Road. As he was sitting at a traffic light, he heard gunshots nearby. Mr. Miller testified that he "located two cars in [his] side mirror going in the opposite direction. The one car pulled up next to the other car and - uh - they started firing again." He further testified:

> Uh - - when they fired again, I was watching in - - in my side mirror. Uh - - and, uh - - I saw - - uh - - either a black sleeve, or a black arm, holding a black semi-automatic. I personally own a Tarurus (phonetic) [sic] nine [millimeter]. And, it had the same style and size as that. And, I could - - I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding.

Mr. Miller stated that he saw the arm protruding out of the passenger's side of the car. He then drove a short distance and called police. He was assured that officers were on the scene, and he drove back and talked to an officer there. Mr. Miller testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again." He said that when the shooting "started, it started." Mr. Miller did not know the model of the car involved in the shooting. He said that it was a "sedan-type" vehicle.

Detective Michael Wilson of the Metropolitan-Nashville Police Department testified that he was working as a patrolman assigned to the East Precinct Crime Suppression Unit on February 15, 2006. He and Officer Jason Smith were standing on Joseph Avenue and Evanston late that afternoon and heard multiple gunshots. It sounded as though two different weapons were fired, and he could tell that the shots came from the Dickerson Road area. Detective Wilson and Officer Smith got into their cars and drove south on Dickerson Road to Cleveland Street. Detective Wilson testified that he pulled into the parking lot of the AM/PM Market and saw a small car parked in front of the gas pumps with blood inside it and twelve to fifteen bullet holes in the car on the driver's side. He walked inside the market and saw the victim, who was bleeding. One of the bullets had knocked out the victim's front teeth. Detective Wilson was unable to get much information from the victim before he was taken away by ambulance due to the trauma to his mouth.

Belba Wilson, the victim's mother, testified that she went to Vanderbilt Medical Center on February 15 or 16, 2006, to see the victim. She did not remember if the victim said who shot him, but he was talking about retaliation. Ms. Wilson told him to think of his kids and not take matters into his own hands.

Officer Woodrow Ledford testified that he responded to the shooting on Dickerson Road. He drove to the AM/PM Market and was then instructed to move further up Dickerson Road around Dunlap and Kyle Tire to look for evidence. The area had businesses along the entire street, and there were several parking lots. Because he was there around 5:00 p.m., the area was "fairly congested" with traffic. Officer Ledford testified that the area had two northbound and two southbound lanes, was two to three miles from downtown Nashville, and was heavily populated. He said that there was not an actual entrance ramp to the interstate from Dickerson Road, but it could be accessed from Spring Street.

Officer Ledford testified that when he pulled into the parking lot of Dunlap and Kyle Tire, a gentleman handed him "12 or so" spent shell casings that he had picked up. There was also a mirror from a vehicle. Officer Ledford also picked up five or six shell casings himself. He believed some of the casings were 40-caliber and some were smaller and appeared to be nine-millimeter. Officer Ledford gave the shell casings to another officer.

Officer Tommy Simpkins of the Metropolitan-Nashville Police Department, Identification Section, testified that he was dispatched to the AM/PM Market on February 15, 2006, and viewed a black, four-door Toyota Corolla. There were several bullet strikes in the vehicle, and he saw some projectile and projectile pieces. Officer Simpkins testified that there were no shell casings inside the Corolla. The windows were up and for the most part remained intact. There were holes on the front driver's door window and the rear driver's side window, and a bullet was found in the door frame of the driver's side. Officer Simpkins collected the victim's clothing, and a "slug" was retrieved from the trunk. He also found a tooth from the victim on the ground outside of the car. Officer Simpkins testified that he was given twelve spent shell casings by Officer Ledford. Seven of the casings were forty-caliber and five were nine-millimeter.

Detective Terrence Bradley testified that paramedics were treating the victim when he arrived at the AM/PM Market, and he followed the ambulance to the hospital. He spoke briefly with the victim who gave him a description of what happened. Detective Bradley testified that the victim gave him the names of Defendant Braxton and Defendant Harris. He said that the victim was in a lot of pain and did not want to talk any more. Detective Bradley then put together a photographic line-up and showed it to the victim at the hospital. The victim identified Defendant Braxton, but could not write because his hands were immobilized. At that time, Detective Bradley had not located anything on Defendant Harris. He later found Defendant Harris in the system and put together another line-up. The victim identified Defendant Harris. Detective Bradley then obtained warrants on Defendants Harris and Braxton.

On cross-examination, Detective Bradley testified that he did not recall asking the victim who shot him while he and the victim were at the market. He said that he stopped talking to the victim at the hospital because the victim became uncomfortable. He did not remember the victim saying that he wanted to take care of things himself, and he probably saw the victim three times at the hospital.

### Defendant Harris' Proof

Willie Sweat, Defendant Harris' step-son, testified that he was living with his mother and Defendant on February 15, 2006. He said that he arrived home from school around 3:30 p.m. and saw Defendant Harris in the restroom vomiting. Mr. Sweat then walked into his room and shut the door. He said that Defendant was at the house all night. Mr. Sweat testified that he could remember the date because it was the day after Valentine's Day, and they had all gone to Chili's to eat with a large group of people.

On cross-examination, Mr. Sweat testified that Defendant Harris was wearing a sleeveless t-shirt and underwear at the time. He said that his mother arrived home around 4:00 or 5:00 p.m. Mr. Sweat testified that he ate supper in his room, but saw Defendant Harris get some soup. He had no idea what time it was. Mr. Sweat admitted that he did not testify on Defendant Harris' behalf at the preliminary hearing. He further admitted that he had never told police or anyone at the district attorney's office that Defendant Harris was at home at the time of the shooting.

Pamela Sweat Harris testified that she was working on February 15, 2006, and arrived home by 4:30 p.m. She said that Defendant Harris walked out of the kitchen complaining that his stomach was hurting, and he told her that he had been vomiting. Ms. Harris testified that Defendant Harris took some medication and walked upstairs. She said that he was at home all night. Ms. Harris testified that she remembered the date because they had gone to Chili's on Valentine's Day with a large group of people.

On cross-examination, Ms. Harris testified that Defendant Harris was wearing a long t-shirt with short sleeves and jeans when she got home. She said that she did not know when Defendant Harris was arrested, and she did not know when the preliminary hearing was held. She also did not help him obtain legal counsel. Ms. Harris testified that she did not speak with Defendant Harris' attorney before the preliminary hearing; however, she thought that she told him at some point that Defendant Harris was at home with her at the time of the shooting.

### Defendant Braxton's Proof

Derrica Christman testified that she was living in the Parkway Terrace Apartments in February of 2006. She met Defendant Braxton in the summer of 2005, and he frequently hung around the apartment complex. Ms. Christman testified that she remembered February 15, 2006, because it was the day after Valentine's Day, and her daughter had attended a dance at Stratford High School. Her daughter only attended Stratford for one year. Ms. Christman testified that her daughter was going to ask Defendant Braxton for a ride to the dance, but Ms. Christman's brother took her instead. She said that the following day, February 15, Defendant Braxton asked how the dance went.

Ms. Christman testified that she saw Defendant Braxton and several others shooting dice near her back porch "no later than" 5:15 on February 15, 2006. She was certain of the time because her children usually arrived home from daycare between 5:15 and 6:00 p.m., and she had to go out and get them off the bus.

On cross-examination, Ms. Christman testified that four or five people usually played dice at her back porch, and Defendant Braxton was frequently there. She said that she and Defendant Braxton had a conversation about her daughter's dance on February 15, 2006, and she saw him on February 13 and 14, but not February 11 and 12. Ms. Christman testified that she also saw Defendant Braxton on February 5 and 6, 2006, and she remembered seeing him in the area around her home on February 5. Ms. Christman said that she did not learn of the shooting until April of 2006 when she was trying to find out why Defendant Braxton was in jail. At the time, she did not tell police or anyone at the district attorney general's office that they had the wrong person. She said that she came forward in October of 2006 after speaking with Defendant Braxton. Ms. Christman acknowledged that her apartment was located near the 700 to 800 block of Dickerson Road.

### State's Rebuttal Proof

On rebuttal, Derrica Christman was recalled as a witness. She testified that if February 6, 2006, was a weekday, she saw Defendant Braxton after 5:00 p.m. She also saw him on February 13, 2006, between 5:00 and 5:15 walking from the building next door to hers. He was wearing the same jacket that she saw him wearing on February 15, 2006. On cross-examination, Ms. Christman said that she last saw Defendant Braxton eight days before February 13, 2006, and she was not sure that she saw him on February 6, 2006. She was certain that she saw him on February 13, 2006.

Wayne Miller, Records Technician for the Davidson County Sheriff's Office, testified that Defendant Braxton was in the custody of Sheriff's Office during February of 2006. He entered the facility at 2:12 p.m. on February 6, 2006, and he left at 4:27 p.m. on February 13, 2006.

Alfred Gray, an investigator for the district attorney general's office, testified that he spoke with Ms. Christman concerning Defendant Braxton's case. Ms. Christman told him that she remembered Defendant Braxton being outside of her home on the night of the shooting. She remembered the incident because it happened the day after Valentine's Day, and Defendant Braxton had been released from jail the day before Valentine's Day. Ms. Christman did not mention anything about her daughter's dance. Investigator Gray indicated that Ms. Christman's residence at Parkway Terrace was located a little less than two miles from the intersection of Grace and Dickerson Road where the shooting took place.

**Analysis**

## I. Sufficiency of the Evidence

Both Defendants challenge the sufficiency of the evidence to support their convictions for second degree murder because they assert that the convicting evidence does not show that they "knowingly" attempted to kill the victim. They also argue that the trial court erred by refusing to grant their motions for judgment of acquittal because the victim's testimony contained "inaccuracies."

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

As for the trial court's denial of Defendants' motions for judgment of acquittal, both Defendants chose to present evidence in their defense, and therefore have waived the right to specifically appeal the denial of their motions for judgement of acquittal. *Finch v. State*,

226 S.W.3d 307, 317 (Tenn. 2007); *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979). In any event, this Court has noted that, "[i]n dealing with a motion for judgment of acquittal, unlike a motion for new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Thus, we will address Defendants' assertions that the evidence adduced at trial was insufficient to support the convictions.

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-13-302(b). A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39-12-101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense ." *Id*. § 39-12-101(b). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000); *see also State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, the proof shows that Defendants Harris and Braxton knowingly shot into the victim's car numerous times with the intent of killing him. The victim testified that he left work around 5:00 p.m. on February 15, 2006, and noticed "a green early nineties model - - uh - - Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim moved into the right lane of Dickerson Pike in an attempt to get onto the interstate and avoid the other vehicle; however, when he stopped his car in traffic, the green car pulled up beside him with Defendant Braxton and Defendant Harris hanging out of the car shooting from the passenger's side. Bullets penetrated the victim's vehicle and struck him in the left upper arm, left lower arm, right hand, finger, and face. The bullet that struck the victim in the face knocked out six of his teeth and remains lodged under his nose. There were sixteen bullet holes in the victim's car as a result of the shooting. The victim spoke with Detective

Bradley and told him that Defendants Harris and Braxton shot him. He also identified them from a photographic line-up.

The victim's testimony was corroborated by Kenneth Miller who testified that he was sitting at a traffic light on Dickerson Road on February 15, 2006, and heard nearby gunshots. He looked into his side mirror and saw two cars pulled up next to each other. Mr. Miller testified that he saw a black sleeve or arm protruding out of the passenger's side of one of the cars holding a black semi-automatic handgun. He saw the weapon fired into the other vehicle. He said, "And I could - - I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding." Mr. Miller further testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again."

Based on our review, we find that a rational trier of fact could conclude beyond a reasonable doubt that Defendants Harris and Braxton knowingly attempted to kill the victim. Moreover, the jury resolved any inaccuracies or issues with credibility in favor of the State.

## II. The Victim's Prior Criminal History

Defendants both contend that the trial court erred in precluding them from questioning the victim on cross-examination about (1) an incident that occurred twelve years earlier when he was shot during a home burglary and (2) about his prior arrest for being in possession of two pistols and a thirty-round magazine while wearing a bullet proof vest.

Our supreme court has recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001). Denial of the defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *Coffee v. State*, 188 Tenn. 1, 216 S.W.2d 702, 703 (1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

In *State v. Brown*, our supreme court set forth the necessary analysis when determining whether the constitutional right to present a defense has been violated by the exclusion of evidence. *Brown*, 29 S.W.3d at 433-434. Specifically, we must consider "whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id*. at 434.

"[W]hether excluded evidence is critical to a defense is a fact-specific inquiry." *State v. Flood,* 19 S.W.3d 307, 317 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 303, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)). "Our supreme court has suggested that for evidence to be considered critical to the defense, the evidence must have some probative value and 'exclusion of the evidence would undermine an element of a particular defense.'" *State v. Cyntoia Denise Brown*, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at (Tenn. Crim. App., at Nashville, Apr. 20, 2009), *perm. to appeal denied* (Tenn. Sept. 28, 2009)(quoting *Flood*, 219 S.W.3d at 317). Regarding the third *Brown* factor, the interests supporting exclusion of the evidence, a criminal defendant's right to confront and cross-examine witnesses against her or him is limited by Rule 402 of the Tennessee Rules of Evidence in that neither party "may cross-examine a witness on matters that are irrelevant." *State v. Williams*, 929 S.W.2d 385, 389 (Tenn. Crim. App. 1996). As our supreme court has observed, "the right to confront witnesses is satisfied if defense counsel receives wide latitude at trial to cross-examine, because the confrontation clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" *State v. Middlebrooks,* 840 S.W.2d 317, 332-33 (Tenn. 1992), *superceded by statute on other grounds as stated in State v. Stout,* 46 S.W.3d 689, 705 (Tenn. 2001).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under Tennessee Rule of Evidence 402, irrelevant evidence is not admissible. Relevant evidence is generally admissible but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See id.* 402, 403. A trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion. *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In this case, prior to trial, Defendant Harris filed a "Motion in Limine/Notice of the Defense Counsel's Intent to Introduce the Prior Criminal History of James Williams." The motion listed seven "prior Convictions or Prior Bad Acts" including two for unlawful possession of a weapon and "Weapon commission of Offense While Wearing a Body Vest." The motion also contained the following statement: "This Notice is given pursuant [to]

-11-

Tennessee Rules of evidence 609 and 405 for impeachment purposes and in order to adequately defend Mr. Harris."

At a pre-trial hearing on the motion, the State challenged the admissibility of several of the convictions and bad acts, and defense counsel agreed to remove the claims of domestic assault, reckless endangerment, and one claim of unlawful possession of a weapon because they were not criminal convictions. Defense counsel also agreed that the claim of "Weapon commission of Offense While Wearing a Body Vest" was not a conviction. Concerning the admissibility of that prior act however, the following exchange took place at the hearing:

THE COURT: Is this somehow still admissible?

[DEFENSE COUNSEL]: Yes, it is, Your Honor. It goes to the Defendant's reputation - -

THE COURT: The Defendant's?

[DEFENSE COUNSEL]: I'm sorry, the victim's reputation - - alleged victim's reputation. And, also, I think it's substantive proof in this matter that other people tried to kill him, simply because I think it's consistent with (indiscernible) that somebody roams around the - - the city of Nashville - -

THE COURT: Okay. You've thrown about five things, potential rules, out; one, you're saying that he had potential - -

[DEFENSE COUNSEL]: Well - -

THE COURT: - - potential what? What are you - -

[DEFENSE COUNSEL]: - - It just demonstrates to me, Your Honor, that other people that, maybe, are unknown to the State - -

THE COURT: The fact that he's arrested for wearing a body vest?

| | |
|---|---|
| [DEFENSE COUNSEL]: | No, I think it's consistent with the fact that somebody's attempting to kill him. And I just - - it would just be estab - - |
| THE COURT: | Okay. Do you have proof of some third-party person that's after Mr. Williams? |
| [DEFENSE COUNSEL]: | I do not, Your Honor. And I'm - - of course, it's our contention that Mr. Harris is certainly not one of them. However, I mean, I just rest on the fact that - - |
| THE COURT: | Okay. Well, then explain to me how an arrest for wearing - - carrying a weapon - - I don't even know what offense this is - - but you've got weapon, commission of offense while wearing a body vest, has some relevancy to whether or not there was an attempted murder perpetrated against him by Mr. Harris or Mr. Braxton. |
| [DEFENSE COUNSEL]: | I just think that that is conduct by the victim that's consistent with the fact he's shooting - - he's being shot at by other people, that he feels like it's in his best interest to wear a bullet-proof - - or body armor. That's - - |
| THE COURT: | I've not any proof about people shooting at him. Do you have that? |
| [DEFENSE COUNSEL]: | No, I don't. |
| THE COURT: | Do you wanna (sic) proffer - - |
| [DEFENSE COUNSEL]: | No, I do not, Your Honor. |

Counsel for Defendant Braxton then argued that the victim's arrest in 2004 for being in possession of two weapons, one with a thirty-round clip and with the serial number removed, while wearing a "body vest" and him being previously shot in the back during a burglary demonstrated that the victim "is a guy with enemies, who knows he has enemies; and it

makes it more likely that it is someone else who shot him on February the fifteenth of two-thousand six."

Prior to the victim's testimony at trial, in a jury-out hearing, the victim testified concerning his conviction in November of 2004 of being a felon in possession of a weapon. He admitted that when he was arrested, he was in possession of two handguns, one of which was a Glock with a thirty-round clip. He was also wearing a bullet-proof vest. The victim testified that he was shot in the back twelve years earlier, which required surgery. He said that neither Defendant Braxton nor Defendant Harris were involved in the shooting. Counsel for Defendant Harris then stated to the trial court: "It's not character evidence that I'm going for. It's taken - - uh - - as a whole, all the events, shows that Mr. Williams leads a dangerous life style." Counsel further stated: "You don't go around wearing body armor unless you think somebody is going to shoot you." The following exchange then took place between the trial court and counsel for Defendant Harris:

| THE COURT: | But, you're not arguing credibility purposes. You're wanting to introduce other things other than 609 convictions. You just said it's for substantive evidence. |
|---|---|
| [DEFENSE COUNSEL]: | Well, Judge, I - - I don't think there is any question when it's a defendant the rules are different. It would fall under 404(b) and, if those convictions or different incidents were to go to show - - go to show not propensity, but, - - |
| THE COURT: | Okay. |
| [DEFENSE COUNSEL]: | - - motive or - - |
| THE COURT: | That might be true. But, isn't it all character? |
| [DEFENSE COUNSEL]: | Under 404(b), would it be? I - - |
| THE COURT: | No. I mean, you're wanting to disparage the character of Mr. Williams. |
| [DEFENSE COUNSEL]: | I don't think that's what I'm trying to do. I wouldn't put it that way. I'm trying to say that - - |

| | |
|---|---|
| THE COURT: | So, you're not wanting to get up in closing arguments in front of the jury and say look at all this man's convictions. You think - - there are fifty people after him, we could assume. And, he wants to suddenly point his finger at my client. You're not wanting to argue that. |
| [DEFENSE COUNSEL]: | I don't think that goes to character, Judge. I think it goes to who could have shot him. |
| THE COURT: | Okay. Who could have? |
| [DEFENSE COUNSEL]: | Someone else and that's all that's important. |
| THE COURT: | Based on his carrying weapons. |
| [DEFENSE COUNSEL]: | Well, I mean, if you put it that simply - - |
| THE COURT: | And, the convictions. |
| [DEFENSE COUNSEL]: | - - that wouldn't work. But, - - carrying weapons convictions, being shot, wearing body armor. |

The trial court then held that evidence of the victim being shot twelve years earlier and evidence of his possession of weapons while wearing body armor was not relevant:

In terms of the proffer involving Mr. Williams and the body armor and want to get outside the fact of a conviction and get into the facts surrounding those convictions, I think the convictions speak for themselves, first of all, in terms of multiple, three I think, felony possessions of a weapon . . . aggravated assaults, attempted - - attempt to commit aggravated robbery . . . give the jury what-ever view they might see of Mr. Williams through those convictions, speak for themselves, especially when the body armor issue that Mr. Sprouse is wanting to get into occurred sixteen months prior to this incident. It's not like it was six days or six months. It's sixteen months, which lessens the probative value what it is being offered for. I'm caught wearing body armor in 2004, therefore, somebody must be after me in 2006. I just don't see the relevancy of that, nor do I see the relevancy of asking Mr. Williams if he has ever been shot before, twelve years prior to this particular allegation being made.

Rule 404(a) of the Tennessee Rules of Evidence generally provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of providing action in conformity therewith." Nonetheless, evidence of a victim's character may be admissible under certain circumstances. For example, under Rule 404 (a), the defendant in a criminal case may offer "evidence of a pertinent trait of character" of the victim. "Evidence is called 'pertinent' when it is directed to the issues or matter in dispute, and legitimately tends to prove the allegations of the party offering it." *Black's Law Dictionary* 1145 (6th ed. 1990). In other words, to qualify as "pertinent," the character evidence must be relevant." *Id.*

In the present case, we conclude that the trial court did not err in excluding evidence of the victim being shot during a burglary twelve years prior to the shooting in this case nor did the court err in excluding evidence concerning the victim's wearing a bullet-proof vest sixteen months prior to the shooting. Although the trial court did not specifically state that the probative value of this evidence was outweighed by its prejudicial effect, such was implied in the court's ruling. Any connection between Defendants' claim that someone else shot the victim and the victim being shot twelve years earlier and his wearing of a bullet-proof vest sixteen months earlier is too tenuous for the evidence to be considered critical to the defense. Defendants are not entitled to relief on this issue.

## III.    Testimony Regarding Defendant Braxton's Prior Incarceration

Defendant Braxton argues that the trial court erred in allowing Wayne Miller of the Davidson County Sheriff's Office, Records Division, to testify in rebuttal that he was checked into the Davidson County Jail at 2:12 p.m. on February 6, 2006, and that he was released at 4:27 p.m. on February 13, 2006. He contends that the testimony "was unduly prejudicial and its probative value was outweighed by its prejudicial effect and violated Rule 403 of the *Tennessee Rules of Evidence*."

As previously discussed, Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). We also point out that rebuttal evidence " is that which

tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). It is also within the trial court's sound discretion to allow or reject rebuttal evidence. *State v. Green*, 613 S.W.2d 229, 234 (Tenn. Crim. App. 1980).

During the trial Derrica Christman, an alibi witness for Defendant Braxton, testified during direct examination that she saw Defendant Braxton shooting dice on her back porch no later than 5:15 p.m. on February 15, 2006, the day that the victim was shot. During cross-examination by the State, the following testimony was elicited from Ms. Christman:

> Q.     When was the last time you had seen [Defendant Braxton] prior to February 15th, 2006?
>
> A.     February 14th.
>
> Q.     Okay. And, prior to February 14th?
>
> A.     February 13th.
>
> Q.     You had seen him on the thirteenth. Had you seen him on the twelfth?
>
> A.     No.

This was the extent of Ms. Christman's testimony during Defendant Braxton's proof which dealt with when she had observed Defendant Braxton on February 5, 6, or 13.

After both Defendants had submitted their proof, the State called Ms. Christman as a rebuttal witness to further testify as to when she had last seen Defendant Braxton prior to February 15, 2006. Her entire testimony in rebuttal is as follows:

[DIRECT EXAMINATION BY STATE]

> Q.     Ms. Christman, uh - - the last time you testified was a little while ago, you mentioned that you saw Mr. Braxton on February 6th - - uh - - of 2006, is that correct?
>
> A.     Uh - huh.
>
> Q.     Do you remember if that was in the morning, the afternoon or the night time?

A.    Had to be like in the evening, afternoon, evening.

Q.    Okay. When you say the evening, what time would you put that to be the best of your memory?

A.    Uh - - five or so, after five.

Q.    And, it would be - - you base that time on the same thing, about when your children get home from school. So, on February 6th, you would have seen him that evening after your children had been off the bus?

A.    If - -

Q.    Is that a yes?

A.    If that was a week day, then, yes.

Q.    Okay. Well, do you remember what February 6th was?

A.    No.

Q.    But, to the best of your recollection it was around five o'clock, correct?

A.    Yes.

Q.    Okay. And, did you also say that you saw him on the thirteenth of February, - -

A.    Yes.

Q.    - - of 2006?

A.    Uh-huh.

Q.    And, about what time did you see him?

A.    Uh - - it was . . . between five and five fifteen.

Q.    And, what was he doing when you saw him on the thirteenth?

-18-

A.    He was coming from the next building beside my building.

Q.    Okay.  And, what was he wearing at the time?

A.    He was  - - uh - - either brown or green jacket with patches on it.

Q.    Now, we're talking not on the fifteenth.  We're talking on the thirteenth.

A.    Yeah.

Q.    Okay.  And, he was wearing that same outfit?

A.    Uh-huh.

Q.    Okay.  And, - -

A.    Same jacket at least.

Q.     - - that would have been around five fifteen on - -

A.    Yes.

Q.     - - thirteenth of February, 2006?

A.    Uh-huh.

Q.    And, to your knowledge does he have any  - - he doesn't live where you are, does he?

A.    No.

[CROSS EXAMINATION BY DEFENDANT BRAXTON'S COUNSEL]

Q.    On cross-examination, your last cross-examination, uh - - you were asked when the last time you saw Mr. Braxton was previously to the thirteenth?

A.    Yes.

-19-

Q.      Do you know when that was?

A.      It was . . . it was more than a week.  It was maybe . . .

Q.      Do you know when it was?

A.      Maybe eight days before the thirteenth.

Q.      Okay.  Let me . . . do you remember specifically?  Is there anything special about that day that would make you remember it?

A.      Other than that was the last time I had seen him until I saw him a week or so later.

Q.      Okay.  So, you wouldn't swear by the fact that it was the sixth?

A.      No.  I'm not sure.

Q.      Okay; thank you.

In response to Ms. Christman's testimony, the State called Wayne Miller of the Davidson County Sheriff's Office, Records Division. Counsel for Defendant Braxton objected on the ground that while possibly relevant, Mr. Miller's testimony that Defendant Braxton was taken into the custody of the Davidson County Jail at 2:12 p.m. on February 6, 2006, and he was released on February 13, 2006, at 4:27 p.m. should not have been admitted because it was more prejudicial than probative.  Specifically, the following colloquy occurred between Defendant Braxton's counsel and the trial court:

THE COURT:              The second time?

[DEFENSE COUNSEL]:  Yes, Your Honor, the second time.  Uh - - but, keep in mind - -

THE COURT:              What did she say during her testimony when you called her?

[DEFENSE COUNSEL]:  What did she say during the tes - - when I called her the first time?

THE COURT:              Uh - - huh.

-20-

| | |
|---|---|
| [DEFENSE COUNSEL]: | During my direct? |
| THE COURT: | No, her full testimony. |
| [DEFENSE COUNSEL]: | During her cross-examination she said she had seen him on February 6th, but, her testimony was not clear . . . it was not precise. From - - -uh - - my recollection of it, she - - uh - - was not - - - it was February 4th or February 5th or February 6th, she was not sure. And, that is not - - |
| THE COURT: | Is that what she said? |
| [DEFENSE COUNSEL]: | I don't know - - uh  - - that is what I remember it is.  I'm not one hundred percent sure of that. |
| THE COURT: | Okay.  I've got it that she saw Mr. Braxton on two five and two six in the area around her house. When she was called back by the State, she said it was February - - on February 6th, had to be in the evening after five p.m. |
| | Then, you got back up on recross and said, are you really wanting to swear that you saw - - that you saw him on two six?  And, she said, well, I don't know, I'm not sure. |

The transcript reflects that Ms. Christman testified during Defendant Braxton's case-in-chief that she saw Defendant Braxton "maybe February 5th or the 6th." (emphasis added). This was the testimony the State was entitled to rebut in its rebuttal proof; the State was not entitled to rebut the more "definitive" testimony of seeing Defendant Braxton on February 6th during her testimony as a <u>rebuttal</u> <u>witness</u> for the State.  This Court has explained:

> The phrase "rebuttal evidence" may be defined as evidence "which tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). This phrase encompasses "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced" by an adverse party. *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979).  Rebuttal evidence is properly admitted for the purpose of impeaching a witness through the use of a prior

-21-

inconsistent statement. *Monts v. State,* 218 Tenn. 31, 57-58, 400 S.W.2d 722,
733-734 (1966); *Gray v. State,* 194 Tenn. 234, 247-248, 250 S.W.2d 86, 92
(Tenn. 1952); *Beasley v. State,* 539 S.W.2d 820, 824 (Tenn. Crim. App. 1976).
*See* Tenn. R. Evid. 613(b).

*State v. Braden*, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993).

We conclude that the trial court erred by overruling Defendant Braxton's objection
to Mr. Miller's testimony. In a close case this error, which allowed an employee of the
sheriff's office to testify as to the incarceration of a defendant on obviously unrelated charges
prior to the commission of the offense for which the defendant is being tried, could result in
the necessity for granting a new trial. However, we are confident in concluding in this case
that the error was harmless. Defendant Braxton is not entitled to relief on this issue.

## IV. Sentence Length

In this case, Defendants argue that their sentences are excessive as to their attempted
second-degree murder convictions because the trial court erred in finding that they used a
deadly weapon during the commission of the offense.

A trial court is mandated by the Sentencing Act to "impose a sentence within the
range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required
to begin with a presumptive sentence subject to increase and decrease on the basis of
enhancement and mitigating factors." *Carter*, 254 S.W.3d, 335, 346 (Tenn. 2008).
Therefore, an appellate court is "bound by a trial court's decision as to the length of the
sentence imposed so long as it is imposed in a manner consistent with the purposes and
principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the
evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the
principles of sentencing and arguments as to sentencing alternatives; (d) the nature and
characteristics of the criminal conduct involved; (e) evidence and information offered by the
parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated
sections 40-35-113 and 40-35-114; (f) any statistical information provided by the
Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses;
and (g) any statement the Defendant wishes to make in the Defendant's own behalf about
sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70
S.W.3d 698, 704 (Tenn. 2002).

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*., 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

As a range I offender convicted of a Class B felony, the applicable range of punishment for Defendant Harris was no less than eight nor more than twelve years. T.C.A. § 40-35-112(a)(2). As a Range II offender convicted of a Class B felony, the range of punishment for Defendant Braxton was no less than twelve nor more than twenty years. T.C.A. § 40-35-112(b)(2).

The trial court applied enhancement factor (1) that both Defendants had a previous history of criminal convictions or criminal behavior, in addition to those necessary to

establish the appropriate range. T.C.A. § 40-35-114(1). The trial court found that Defendant Harris had "three prior felonies, a felony cocaine case, a felony theft case and a felony evading arrest case, and ten misdemeanor convictions, including a prior carrying a weapon conviction." In addition to the convictions necessary to establish Defendant Braxton as a Range II offender, he has "the prior 'E' felony . . . , and in addition six misdemeanor convictions, non-driving misdemeanor convictions." The trial court also applied enhancement factor (6) that extensive personal injury was inflicted upon the victim. T.C.A. § 40-35-114(6). At trial, the victim testified that after the shooting, he was transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. He said that one of the bullets struck him in the upper arm, which required a metal plate. A bullet also went through his hand and lodged in his wrist, and one struck his finger and his face. The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose, and he lost six teeth.

The trial court applied enhancement factor (8) that both defendants had a previous history of unwillingness to comply with release into the community. Defendant Harris had two prior probation violations, and Defendant Braxton had three. T.C.A. § 40-35-114(8). The trial court applied enhancement factor (9) that Defendants possessed and employed firearms in the commission of the offense. T.C.A. § 40-35-114(9). Concerning this factor, the court noted: "There is the enhancing factor as to both that a weapon was used, a firearm, multiple times, two different weapons according to the circumstantial proof . . .fired thirteen or so plus times into Mr. William's car." The trial court applied enhancement factor (11) that the offense involved the threat of death or serious bodily injury to other persons, in Defendant Braxton's case, as he had been previously convicted of a felony that resulted in death. T.C.A. § 40-35-114(11). The trial court pointed out that "there was a high risk of injury to others there in the community when this shootout occurred, one sided shootout occurred there in broad daylight with high traffic, including the witness, Mr. Miller, who testified at the trial." The court further noted that Defendant Braxton had a prior manslaughter conviction. Finally, the trial court applied enhancement factor (13) to Defendant Braxton's sentence noting that he was on probation at the time of the offense. T.C.A. § 40-35-114(13). The trial court did not find any applicable mitigating factors as to either Defendant.

Both Defendants argue that the trial court erred in finding that they employed firearms during the commission of the offenses because they contend that it is an element of the offense of attempted second degree murder. However, use of a deadly weapon is not an essential element of that offense. *See* T.C.A. §§ 40-35-114, 39-13-210, and 39-12-101; *State v. Matthew Joseph Carter*, No. E2009-00217-CCA-R3-CD, 2010 WL 4324386 (Tenn. Crim. App. Nov. 2, 2010) *no perm. app. filed*.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of eleven years for Defendant Harris and nineteen years for Defendant Braxton. Defendants are not entitled to relief on this issue.

Defendant Harris also seems to argue that he should not have been ordered to serve his sentence in confinement. However, he does not support his argument with appropriate references to the record or reasons why he should be granted relief. Therefore this issue is waived. Tenn. R. App. P. 27(a)(7)(A).

## VI. Ineffective Assistance of Counsel

Both Defendants argue that they received ineffective assistance of trial counsel in this case. More specifically, both Defendants argue that their respective trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton also argues that trial counsel was ineffective for (a) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of his convictions; (b) failing to amend the original notice of alibi; (c) failing to investigate possible defenses or alibi witnesses; and (e) failing to adequately meet and prepare for trial. Defendant Harris contends that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim.

Claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington*, 466 U.S. 668, 689-90, 694, 104 S.Ct. 2052, 2065, 2067, 80 L.Ed.2d 674 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. *See* T.C.A. §§ 40-30-109(a),-110 (2006). Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f) & (h)

(2006). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40-30-106(f). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal, we will proceed with our analysis of each Defendant's claims.

Under Tennessee Code Annotated section 40-30-110(f) (2003), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n. 5 (Tenn. 1999) (citing *State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The factual findings entered by the trial court are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn.2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State*, 911 S .W.2d 334, 347 (Tenn. Crim. App. 1994); *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*A. Failure to Request a Jury Instruction on the Lesser-Included Offense of Reckless Endangerment.*

Defendant Braxton and Defendant Harris both contend that their respective trial counsel was ineffective for failing to request a jury instruction on the misdemeanor offense of reckless endangerment as a lesser-included offense of attempted premeditated first degree murder.

Initially, we note that each Defendant has the burden of proving that he or she was prejudiced by an alleged deficiency on the part of trial or appellate counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to establish prejudice, each Defendant

must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. A defendant is required to request in writing that the trial court instruct the jury on any specifically identified lesser included offense. T.C.A. § 40-18-110(a). In the absence of such a request, the trial court may charge the identified lesser included offense, but the defendant is not entitled to the charge. *Id.* § 40-18-110(b). Reckless endangerment is a lesser included offense of attempted first degree murder. *See State v. Rush*, 50 S.W.3d 424, 431-32 (Tenn. 2001). If it had been included in the jury charge, it would have been listed <u>after</u> aggravated assault.

In this case, Defendants were indicted for the offense of attempted first degree murder. The trial court instructed the jury on the indicted offense and the lesser included offenses of facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury. The jury convicted Defendants of attempted second degree murder to the exclusion of the immediate lesser included offenses. Harmless error may be shown where the jury convicts on the higher offense to the exclusion of the immediately lesser offense, necessarily rejecting other lesser offenses. *State v. Williams*, 977 S.W.2d. 101, 106 (Tenn. 1998). Therefore, we conclude that Defendants were not prejudiced by trial counsels' failure to request jury instruction on the lesser included offense of reckless endangerment.

*B. Failure to Object to the Sentence or request a Continuance When the State Did Not Provide Proper Notice of Intent to Seek Enhanced Punishment or Provide Certified Copies of Defendant Braxton's Convictions.*

In his motion for new trial, Defendant Braxton raised the following issue concerning his sentence:

> Defendant was denied effective assistance of counsel when counsel failed to object to the State's failure to file a Notice of enhanced punishment and allowing certain convictions to be used against the Defendant at sentencing, by not requiring certified copies of those convictions to be used, and by failing to make a motion for a continuance.

The trial court, in its order denying Defendant Braxton's motion for new trial held: "The Court accredits the testimony of trial counsel that he investigated all of the defendant's prior

convictions and believed they were valid. The Court finds the State had filed timely a notice of enhanced punishment."

The record supports the trial court's finding. At the hearing on the motion for new trial, counsel for Defendant Braxton testified that the State had filed a notice of enhanced punishment but did not provide certified copies of his convictions at the sentencing hearing. Trial counsel admitted that he did not object to the hearing. He said:

> I checked them out myself. I - - I suppose I - - I could have objected, there weren't any certified copies. And it is my understanding that , if that had been objected to, the - - it just would've been continued for ten days, because, while we are entitled to notice, I don't necessarily know if it's like a gotcha (sic) thing, sort of, "You didn't give us notice, so I'm sorry."

Defendant Braxton has failed to show that he was prejudiced by trial counsel's failure to object to his enhanced sentence or by failing to request a continuance. He is not entitled to relief on this issue.

*C. Failure to Amend the Original Notice of Alibi*

Defendant Braxton next contends that trial counsel was ineffective for failing to amend the notice of alibi filed by his previous counsel to include an additional witness, Lateisha Martin. The trial court held that trial counsel made a tactical decision not to call Ms. Martin and did not render ineffective assistance of counsel.

Again, the evidence presented at the hearing on Defendant's Braxton's motion for new trial supports the trial court's decision. At the hearing, trial counsel testified that it was his understanding that all of the alibi witnesses that Defendant Braxton intended to call at trial were listed on the notice filed by previous counsel. However, trial counsel admitted that he was mistaken, and Ms. Martin was not listed on the notice. The following exchange then took place:

> Q.   Did you have a bench conference regarding that particular witness?
>
> A.   I don't remember if we had a bench conference or not. I know the issue was discussed. The State stood up and said, "If this witness is going to be called for alibi witnesses, they are not listed, we've had no notice."

-28-

I don't believe Judge Dozier made a ruling on whether or not she would be allowed to testify. I think the issue was just kinda (sic) tabled. And I called Derrica Christman at that point; she was listed - -

Q. Who was listed - -

A. - - on the notice. After her testimony the issue was re-raised and - - as to whether or not she would be allowed to testify.

And at that point I made the decision, based upon how Mr. Harris' alibi witnesses had testified, that, quite frankly, even I decided to press the issue and the Judge were to allow me to call her as an alibi, I was worried.

And I thought Ms. Christman had done a good enough job that I just simply chose not to push the issue.

Q. Did you discuss that decision, not to call that particular witness, with Mr. Braxton?

A. I'm sure that we whispered at the table about it, that, you know, "This is why I'm not pushing the issue, and it's my fault that she wasn't listed on the notice. But, quite frankly, at this point I don't know if I'd call her anyway."

But, no, there was no - - there was no recess, we didn't have an opportunity to, like, really get into it. We just whispered about it at the table.

Q. What was your understanding of Mr. Braxton's position on that?

A. I don't - - I don't remember him voicing strong objection to my position on it. I - - I - - I don't remember that happening. I'm not saying it didn't, but I don't remember it happening.

Q. So, you don't recall if - - whether or not he - - that - - that - - in other words this was a tactical decision that you made, didn't - - didn't necessarily have to wait on the Court to rule on that, it was - -

A.     Lemme (sic) be clear.  It was not a tactical decision to leave her off the notice; and, if I had that to do over again, she would've been on the notice, without question.

But at the time, when it came to - - to re-raise the issue, where I could've asked the Court, "Well, despite the fact that she's not on the notice, I wanna call her anyway," that's when I - - yes, I decided at that point that, quite frankly, even it I would, I did not want to - -

Q.     Okay.

A.     - - recall her.

Q.     But - - and, so, it was a tactical decision to not push the issue.

On cross-examination, trial counsel further testified:

Q.     With regard to the second alibi witness, who was not called, you've indicated that you had decided during the trial, during watching Mr. Harris' alibi witnesses testify, that you did not want to call this second alibi witness anyway.

A.     Yes, that's - - I mean, it was a toss-up; but, counting the fact that I'd left her off the notice and the fact that I was worried about conflicting testimony from the two of them, I decided that I was not going to push the issue with the Court.

I don't know if I'm muddling the issue or not.

THE COURT:     (To the Witness) Worried about conflicting testimony between anyone that may or may not could've been called versus -

THE WITNESS:     Derrica Christman.

THE COURT:      - - the one that was called.

THE WITNESS:     That's correct.

-30-

THE COURT:        Okay.  Well, I mean, did you have some information, as
                  or after Ms. Christman was testifying, that - if I can find
                  it here again (consulted file notes) - that Ms. Martin may
                  have some inconsistent information?

THE WITNESS:      Not on any material facts.  I spoke with them both
                  beforehand, and I was not about [to] put them on the
                  stand, if I thought they were going to perjure themselves,
                  no.

THE COURT:        Right.

THE WITNESS:      I mean, the material facts - I could not discern any
                  inconsistencies between the two of them.

                  What I was speaking to more specifically is, when Mr.
                  Harris' alibi witnesses testified, there were several
                  questions about that they were wearing and that they had
                  to eat and what time and what happened afterwards, quite
                  frankly, things that were immaterial to the case, but
                  nevertheless asked about, which they were dramatically
                  different on.

                  And - and I did not – I thought Ms. Christman had done
                  such an excellent job testifying, that I didn't wanna run
                  the risk of messing up her testimony.

Trial counsel clearly made a tactical decision not to call Ms. Martin at trial, and
Defendant Braxton has not presented any evidence to the contrary.  Even if trial counsel had
rendered deficient performance in failing to add Ms. Martin to the notice as an alibi witness,
Defendant Braxton has not demonstrated any prejudice since he did not call Ms. Martin to
testify at the hearing on his motion for new trial.  *See Pylant v. State*, 263 S.W.3d 854, 869
(Tenn. 2008); *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1190).

D.      *Failure to Investigate Possible Defenses or Alibi Witnesses.*

        Defendant Braxton argues that trial court was ineffective for failing to investigate any
possible defenses that he had to the offense or to investigate the alibi witnesses provided to
him.  As pointed out by the State, this issue was not raised in Defendant Braxton's motion
for new trial or in his amended motion, and he may not raise the issue for the first time in this

court. On direct appeal, our review is limited to the issues specifically raised in a motion for new trial. *See* Tenn. R. App. P. 3(e). "When an issue is raised for the first time on appeal, it is typically waived." *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); Tenn. R. App. P. 36(a) ("relief may not be granted in contravention of the province of the trier of fact."). Therefore, this issue is waived.

*E.     Failure to Adequately Meet and Prepare for Trial.*

Finally, Defendant Braxton argues that trial counsel was ineffective for failing to adequately meet with him and prepare for trial. Again, as pointed out by the State, Defendant Braxton failed to raise this issue in his motion for new trial or in his amended motion. Therefore, the issue is waived. *See* Tenn. R. App. P. 3(e); 36(a); and *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005).

*F. Opening the Door to the Victim's Testimony About an Earlier Attempt by Defendant Harris to Harm or Kill the Victim.*

Defendant Harris argues that his trial counsel rendered deficient performance by asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. At trial, the victim testified concerning the events surrounding the shooting on February 15, 2006. On cross-examination, trial counsel asked the victim about the shooting and questioned him about his prior testimony at the preliminary hearing where the victim indicated that he had no other altercations with Defendant Harris. After being cautioned by the court, trial counsel ultimately asked the victim, "Have you had any other altercations with Mr. Harris" to which the victim replied, "That's correct." Trial counsel then impeached the victim by pointing to the record of the preliminary hearing in which the victim indicated that had not had other altercations with Defendant Harris.

The State then sought to question the victim about a previous altercation during which Defendant Harris allegedly shot the victim in the foot. After a lengthy discussion out of the jury's presence, the trial court determined that the State would be allowed to question the victim about the prior altercation. On redirect examination, the victim testified that one night in October of 2005, someone had been following him. He said:

> I was - - uh - - headed down Gallatin road going to McDonald's to get me something to eat. And, I rolled (phonetic) Mr. Harris, beauty shop, barber shop, whatever it was at the time, and - - uh - - I just noticed a car get behind me. I turned, the car turned. And, I not gonna say it was a chase, but, the car stayed pretty much behind me where I had to speed up to lose the car. And,

I finally side [sic] on a side street. And, I jumped out of the car and jumped in the bushes.

The victim testified that two cars "kept circling the block," and he called a couple of friends to pick him up. He stayed at their house for a few hours and then drove home around 12:45 a.m. The victim testified that he parked his car like he did every night. He then "checked the bushes", and as he walked up the breezeway, Defendant Harris and another individual opened fire on him. The victim said that although he had two handguns on him, he did not have a chance to return fire. He then realized that he had been shot in the foot. The victim testified that there was a third person "who ran on the side of the building and me and him exchanged gun-fire." He then hid under a neighbor's jeep until the three men left.

The victim testified that one of the neighbors called police, and when they arrived, he did not tell them that he saw Defendant Harris or the other two individuals. He explained that he did not want to talk to police because he had two firearms on him, as well as several assault rifles in his home, and he did not want them to search his home.

Concerning this issue, the trial court held:

As to the defendant's allegations that trial counsel was ineffective in opening the door to a prior unproven altercation, the Court notes that trial counsel did ask this question. Before the witness could answer the question, "Have you had any other altercations with Mr. Harris," the Court asked counsel if he wanted to ask that question. Trial counsel said that he did wish to ask the question and the Court permitted him. Although the question opened the ability to question about other incidents in order to fill the conceptual void as to the bad blood between the defendant and the victim, much of this information was admissible if brought out by the State. This information also allowed information about the complaining witness and possible unfavorable demeanor seen by the jury. Even though potentially prejudicial, this was a tactical decision by trial counsel that may have had a valid defense motivation but certainly does not rise to the necessary level of effecting the outcome of the trial.

The record supports the trial court's findings. Trial counsel was able to successfully impeach the victim's testimony at the preliminary hearing where he testified that he had no prior alterations with Defendant Harris. Furthermore, as pointed out by the State, the victim's testimony had no corroboration from any other witness, and the victim admitted that he was in possession of two guns during the shooting, and there were additional assault rifles in the house. When police arrived on the scene, the victim did not tell them who shot at him

because he did not want his own criminal activities discovered. Defendant Harris has not shown that he was prejudiced by trial counsel's performance in this area. The proof presented at trial was sufficient to support Defendant Harris's conviction for attempted second degree murder. This issue is without merit.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
THOMAS T. WOODALL, JUDGE